**AETNA INSURANCE COMPANY,**
Plaintiff,

v.

**The DIRECTOR GENERAL OF THE INDIA SUPPLY MISSION, Defendant and Third-Party Plaintiff,**

v.

**UNITED STATES of America, Third-Party Defendant.**

No. 66 Ad. 530.

United States District Court
S. D. New York.

Sept. 11, 1968.

274

Bigham, Englar, Jones & Houston, New York City, for plaintiff, by Sheldon A. Vogel, and Charles A. Doyle, New York City.

Baker, Nelson, Williams & Mitchell, New York City, for defendant and third-party plaintiff, by O. Taft Nelson and Robert E. Meshel, New York City.

Robert M. Morgenthau, U. S. Atty., for Southern Dist. of New York, for third-party defendant, by Louis E. Greco, and Gilbert S. Fleischer, New York City.

## OPINION

TYLER, District Judge.

On October 30, 1964, the Anne Quinn Corporation, owner of the American flag vessel Smith Voyager, entered into a charter party with defendant, the Director General of the India Supply Mission ("Mission"), agreeing to transport a shipment of wheat from the United States to India aboard the Smith Voyager. While en route to India, the ship sank on December 27, 1964, resulting in a total loss of both vessel and cargo. Plaintiff, Aetna Insurance Company ("Aetna") was the insurer of the shipowner's interest in the freight. Alleging it has paid in excess of $300,000 to the shipowner, Aetna, as subrogee, has commenced this action against Mission to recover the value of the freight, claiming that perils of the sea caused the sinking of the Smith Voyager. Mission, in turn, has impleaded the United States government, alleging that it is entitled to reimbursement from the United States in the event that any recovery is had by plaintiff.

Mission has moved for summary judgment against Aetna. The government has joined in this motion and, further, has made a separate motion to dismiss the third-party complaint. For reasons which will appear below, both motions are granted. F.R.Civ.P. 56(b).

Clause 13 of the charter party between the Anne Quinn Corporation and Mission provides the following:

"(a) Freight to be deemed earned upon arrival of the vessel at the first port of discharge and is payable in accordance with Clause 15 herein, subject to policies of the Commodity Credit Corporation and the United States Department of Agriculture, as embodied in the provisions of the Public Law 480 regulations and the applicable purchase authorizations issued thereunder.

(b) The entire freight shall at all times be at the risk of the vessel's owners." [1]

Defendant argues that both paragraphs (a) and (b) are merely restatements of the common law rule that freight is never earned unless and until the specified goods are delivered to the appointed destination. See, generally, Poor, Charter Parties and Ocean Bills of Lading §§ 28, 30 (4th ed. 1954). Plaintiff disagrees, contending that the reference to Public Law 480 regulations introduces into the charter party a provision which contradicts the other terms of clause 13. This contradiction is said to render the charter party ambiguous, precluding summary disposition of the case. See Union Insurance Soc. of Canton, Limited v. William Gluckin & Co., 353 F.2d 946, 950 (2d Cir. 1965).

Public Law 480 is the popular name for the Agricultural Trade Development and Assistance Act of 1954, 68 Stat. 454,

---

1. Clause 15 of the charter party, titled "Payment of Freight" lists the various documents the shipowner was to submit to Mission upon the vessel's departure from the United States and provides, *inter alia*, that 90% of the freight would have been owed upon Mission's receipt of notice of the vessel's safe arrival.

which, along with the regulations thereunder, provided generally that the United States government would reimburse a foreign country for the added costs incurred by the latter's importation of American surplus produce in the more expensive United States flag vessels. Much of the language of Public Law 480 was superseded by the Food for Peace Act of 1966, 80 Stat. 1526, codified in scattered sections of Title 7, United States Code.

The Public Law 480 regulation apparently relied upon by Aetna is 25 Fed. Reg. 8282 (1960), 7 C.F.R. § 11.9(b) (2) (Supp.Jan.1965) (superseded Dec. 16, 1965) (hereinafter "section 11.9(b) (2)"). Specifically, plaintiff rests its case on the following language, which was promulgated by the Secretary of Agriculture to amend a fragment of the then existing regulations:

"[A] notice of arrival will not be required in the event the vessel is lost or unable to proceed to destination after completion of loading because of damage caused by perils of the sea or other waters, collisions, stranding, jettison, wreck, fire from any cause, Act of God, public enemies or pirates, or by arrest or restraint of princes, rulers or peoples without the fault of the supplier of the ocean transportation, wars, public disorders, captures or detention by public authority in the interest of public safety, provided the owner or operator supplies evidence satisfactory to Commodity Credit Corporation of such disability."

Perhaps its relevance is thought to stem from its position in the Federal Register, immediately following another amendment to those regulations which concern the provisions required to be inserted in all Public Law 480 charter parties. See 25 Fed.Reg. 8281 (1960), 7 C.F.R. § 11.4(d) (8) (Supp.Jan.1965) (superseded Dec. 16, 1965).[2]

Nevertheless, the introductory language of section 11.9 and section 11.9(b) (2):

"§ 11.9 Documentation.

Drafts drawn on CCC and requests submitted to CCC for reimbursement shall be supported by the documents required by this section * * *

(2) One copy of the ocean bill of lading, and, if required by the related CCC Form 106–2, a notice of arrival at the first port of discharge of the vessel named in the CCC Form 106–2, except that a notice of arrival will not be required * * *"

makes it clear that the previously quoted language relating to *force majeure* situations, when read in proper context, refers only to the documentation required by the United States as a precondition to reimbursement of foreign countries under Title I of the 1954 Act.[3] See Cargo & Tankship Management Corp. v. India Supply Mission, 221 F.Supp. 680, 684 (S.D.N.Y.1963), rev'd on other grounds, 336 F.2d 416 (2d Cir. 1964).

■ Section 11.9(b) (2) does not require Title I charter parties to include a provision excusing shipowners for failure to deliver in such situations. Thus, it does not affect the conditions established in the charter party on either the question of when the freight is earned or where the risk for the freight cost lies prior to the completion of the voyage. Instead, it would seem that the section was promulgated to protect foreign governments, operating under Title

---

**2.** Indeed, these provisions, including one entitling the charterer to advance funds to enable the completion of the voyage and deduct such advancement from the freight due, are undoubtedly among those referred to in clause 13(a) of the charter party.

**3.** That the charter party in the case at bar was subject to Title I of the 1954 Act (Sales of Surplus Commodities For For-

eign Currencies), as opposed to Title IV (Long-Term Supply Contracts), is shown by the direct reference to Title I in clause 36 of the charter party and the reference in Clause 15(f) to a Commodities Credit Corporation ("CCC") Form required only in Title I financing. See 24 Fed.Reg. 8832 (1959), 7 C.F.R. § 11.9(c) (Supp.Jan.1965) (superseded Dec. 16, 1965).

I, which had entered into charter parties, unlike the one at bar, permitting shipowners to recover freight charges upon a showing of *force majeure*. The scheme devised was the shifting of part of the risk to the United States government.

The regulations governing this case should be contrasted with those presently in effect which expressly provide that Title I charter parties are deemed to include a provision requiring payment by a foreign government of 90% of freight to the shipowner who proves that a *force majeure* situation was encountered. 7 C.F.R. § 11.12(c) (5) (1968). Today, not only foreign governments, but also all United States flag vessels operating under Public Law 480, receive protection from the designation of the United States as an ultimate risk bearer.

■ Even if the regulation in question were directed at the rights of shipowners as opposed to the rights of foreign governments, it seems clear that summary judgment for Mission would still be required. By its own terms, section 11.9(b) (2) provides that the shipowner must supply "evidence satisfactory to Commodity Credit Corporation" of a *force majeure* situation before non-arrival will be excused.

Aetna concedes no such evidence was ever presented to the CCC, but argues that the *Cargo & Tankship* case, supra, obviates this preliminary step, since the plaintiff in that case was allowed to recover, although it had never received any determination of *force majeure* from the CCC.

The *Cargo & Tankship* case, however, is of no assistance to Aetna. In that case, surplus wheat was transshipped at an American east coast port from a disabled American flag vessel to a foreign flag ship. This was done pursuant to a supplementary charter party, but without any notice to the CCC. The Second Circuit held that the failure of the American vessel to arrive in India was no defense for the importing country in the shipowner's suit for freight. 336 F.2d at 419–420. Further, the court ruled that the importing country was entitled to reimbursement from the United States only for that portion of the journey prior to the transshipment. Id. at 420–421. See 24 Fed.Reg. 8324 (1959), 7 C.F.R. § 11.12(c) (2) (Supp.Jan.1965) (superseded Dec. 16, 1965). Nowhere did either the district court or the Court of Appeals rule, or even suggest, that claims of *force majeure* relied upon to overcome the consequences of the failure of a Public Law 480 ship to arrive need not be initially presented to the CCC.

The plaintiff in the *Cargo & Tankship* case recovered not because it was found to comply with the terms of the initial charter party, but rather because of its fulfillment of the supplementary agreement. Thus, the defense that the American vessel had not arrived at its appointed destination and its nonarrival was not satisfactorily explained to the CCC was rejected because it was deemed immaterial. 221 F.Supp. at 684–685 (S.D.N.Y.).

In the case at bar, plaintiff claims there was a *force majeure* situation, yet no evidence to that effect has been presented to the CCC. Even assuming *arguendo* that section 11.9(b) (2) regulates the legal relationship between Aetna and Mission, Aetna has failed to bring itself within its terms.

■ Summary judgment, therefore, must be entered in favor of Mission and against Aetna on the main complaint. Since defendant has made out its case, summary judgment is similarly required for the United States against Mission's third-party claim for reimbursement. In addition, independent support for the latter judgment can be found in the Tucker Act, 28 U.S.C. § 1346(a) (2) (1964) and the failure of any party to comply with the requirements of section 11.9(b) (2).

Both motions are granted. Settle order and judgment on notice.